<u>AFFIDAVIT IN SUPPORT OF</u>

<u>AN APPLICATION FOR A SEARCH WARRANT</u>

I, Bruce Bennett, being first duly sworn, hereby depose and state as follows:

<u>INTRODUCTION AND AGENT BACKGROUND</u>

1. Your Affiant makes this affidavit in support of an application for a search warrant for a Facebook, Incorporated account associated with Olivia Lone Bear, with the unique identifier <u>olivia.lonebear.5</u>. Your affiant has reason to believe the Facebook account may contain certain information, namely: names, contact information and communications. The Facebook account may contain evidence of the commission of a criminal offense; and/or information designed or intended for use or which is or has been used as a means of committing a criminal offense, concerning a violation of Title 18, United States Code, Sections 1111, 1112 and 1153.

2. Your Affiant is a Special Agent with the Federal Bureau of Investigation (FBI) assigned to the Minot Resident Agency in Minot, North Dakota and has been assigned the task of investigating violent crimes on the Fort Berthold Indian Reservation. Your Affiant has been employed by the FBI since November of 1999.

3. As a Special Agent, your Affiant is responsible for investigating violations of federal criminal statutes including law violations codified in Title 18, United States Code (U.S.C.). The information contained within this affidavit is based on your Affiant's training and experience, and information obtained from other law enforcement agents involved with this investigation including the Three Affiliated Tribes Police Department, Special Agents of the Bureau of Indian Affairs and Special Agents of the FBI. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of your Affiant's knowledge about this matter.

<u>LEGAL AUTHORITY</u>

4. Title 18, United States Code, Section 1111 prohibits the unlawful killing of a human being with malice aforethought.

5. Title 18, United States Code, Section 1112 prohibits the unlawful killing of a human being without malice. It is of two kinds: Voluntary – upon a sudden quarrel or heat of passion and Involuntary – In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

6.      Title 18, United States Code, Section 1153 provides for federal jurisdiction for major crimes committed by Indians in Indian country.  In determining whether an individual is an Indian, federal law gives significant weight to whether the individual is enrolled in a federally-recognized Indian tribe.  The major crimes enumerated in Title 18, United States Code, Section 1153 include violations of Title 18, United States Code, Section 1111 (Murder), Section 1112 (Manslaughter) which falls under Chapter 109A of Title 18.  Indian country is defined by Title 18, United States Code, Section 1151, to include all land within the limits of any Indian reservation.

7.      Under 18 U.S.C. § 2703(g), a law enforcement officer does not have to be present for either the service or execution of the warrant.  I request that Facebook, Inc. be required to produce the electronic communications and other information identified in Attachments A and B hereto.  Because Facebook, Inc. is not aware of the facts of this investigation, its employees are not in a position to search for relevant evidence.  In addition, requiring Facebook, Inc. to perform the search would be a burden upon the company.  If all Facebook, Inc. is asked to do is produce all the files associated with the account, an employee can easily comply.  Requiring Facebook, Inc.to search the materials to determine what content is relevant would add to their burden.

8.      I request that the Court authorize law enforcement agents to seize only those items identified in Attachment B from what is produced by Facebook, Inc. pursuant to the search warrant.  In reviewing these files, I will treat them in the same way as if I were searching a file cabinet for certain documents.  Files will be scanned quickly to determine if they are relevant to my search.  If they are, they will be reviewed.  If I determine that they are not relevant, I will put them aside without reviewing them in full.  This method is similar to what a law enforcement officer would do in the search of a filing cabinet or a seized computer.

9.      This application seeks a warrant to search all responsive records and information under the control of Facebook, Inc., a provider subject to the jurisdiction of this Court, regardless of where Facebook, Inc. has chosen to store such information.  The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Facebook, Inc.'s possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

## BACKGROUND REGARDING FACEBOOK, INC.

10.     Facebook, Inc. owns and operates a free-access social networking website of the same name that can be accessed at http://facebook.com.  Facebook, Inc. allows its users to establish accounts with Facebook, Inc., and users can then use their accounts to share written news,

photographs, videos, and other information with other Facebook, Inc. users, and sometimes with the general public.

11. Facebook, Inc. asks users to provide basic contact information to Facebook, Inc., either during the registration process or thereafter. This information may include the user's full name, birth date, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers, Facebook, Inc. also assigns a user identification number to each account. Users can also setup a "vanity URL" so other users can easily find their Facebook, Inc, pages.

12. Facebook, Inc. users can select different levels of privacy for the communications and information associated with their Facebook, Inc. accounts. By adjusting these privacy settings, a Facebook, Inc. user can make information available only to himself or herself, to particular Facebook, Inc. users, to all Facebook, Inc. users, or to anyone with access to the Internet, including people who are not Facebook, Inc. users. Facebook, Inc. accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook, Inc.

13. Facebook, Inc. users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook, Inc. user can also connect directly with individual Facebook, Inc. users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook, Inc. and can exchange communications or view information about each other. Each Facebook, Inc. user's account includes a list of that user's "Friends" and a "Mini-Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

14. Facebook, Inc. users can create profiles that include photographs, lists of personal interests, and other information. Facebook, Inc. users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook, Inc. users can also post information about upcoming events, such as social occasions, by listing the event's time, location, host, and guest list. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

15. Facebook, Inc. users can exchange private messages on Facebook, Inc. with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, Inc., which also stores copies of messages sent by the recipient, as well as other information. Facebook, Inc. users can also post comment on the Facebook, Inc. profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

16.     Facebook, Inc. also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, Inc., including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook, Inc. profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

17.     Social networking providers like Facebook, Inc. typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook, Inc. users may communicate directly with Facebook, Inc. about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook, Inc. typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

18.     Therefore, the computer of Facebook, Inc. are likely to contain all the material described, including stored communications and information concerning subscribers and their use of Facebook, Inc., such as account access information, transaction information, and account application.

## PROBABLE CAUSE

19.     On October 27, 2017, Olivia Keri Lone Bear, 32 years old, was reported as a Missing Person to the Three Affiliated Tribes (TAT) police in New Town North Dakota by her father, Harley "Tex" Lone Bear. Olivia Lone Bear had been living at her father's residence at 8935 40th Street Northwest in New Town North Dakota. The residence is located within the exterior boundaries of the Fort Berthold Indian Reservation. Harley Lone Bear reported that he had not seen Olivia Lone Bear since Tuesday evening and it was unusual for her to be gone so long without telling someone her location. Harley Lone Bear reported that Olivia Lone Bear was known to drive a teal colored Chevrolet pick-up truck.

20.     After receiving the report that Olivia Lone Bear was missing, TAT law enforcement began a search for Olivia Lone Bear and the teal colored Chevrolet truck. All search efforts for Olivia Lone Bear were met with negative results. Other Lone Bear family members identified the owner of the teal colored truck as James (later identified as James Hofhenke). Hofhenke provided a license plate number for the truck as 839BRC, North Dakota. TAT law enforcement confirmed the vehicle bearing 839BRC was registered to James Hofhenke.

21.     Over the course of several months, numerous family members and possible witnesses were identified and interviewed by law enforcement. No information was collected that identified the location of Olivia Lone Bear or the teal colored Chevrolet. Items of electronic

media and all associated data, including cellular telephones, were also collected and examined, however, none of the collected information or data identified the location of Olivia Lone Bear or the teal colored Chevrolet. Law enforcement and civilian groups conducted numerous coordinated searches throughout the Fort Berthold Indian Reservation and North Dakota. All search efforts prior to July 27, 2018 met with negative results.

22.  During the week of July 23 through July 27, 2018, a civilian searcher using a small boat equipped with sonar located what the searcher believed to be a truck submerged in Lake Sakakawea near Sanish Bay. The searcher took photographs of the sonar produced images and provided the images to TAT law enforcement on July 27, 2018.

23.  On July 31, 2018, a law enforcement diver located the same vehicle described above and arranged to have the vehicle towed from the water. The vehicle was located in the water off the shore of a small boat dock area approximately one and a half miles from Olivia Lone Bear's residence. The vehicle that was towed from the water was a Chevrolet Silverado bearing North Dakota license plate 839BRC. The vehicle contained the deceased body of an apparent Native American female. The deceased body was on the front passenger seat with a buckled seat belt restraint around the waist. Law enforcement, including the North Dakota Bureau of Criminal Investigation, the Federal Bureau of Investigation, the Bureau of Indian Affairs and Three Affiliated Tribes assisted in the removal of the body and photographing the truck. The body was transported to Grand Forks for an autopsy. The truck was not searched for evidence, but was loaded onto a tow truck and transported to a secure facility in Bismarck.

24.  On August 1, 2018, an autopsy was conducted on the body recovered from the truck. Based on North Dakota Medical Examiner (ME) Walter Kemp's examination and information previously provided by family members, the body recovered in the truck was identified as Olivia Keri Lone Bear. The preliminary findings of the examination did not immediately identify a clear cause of death and ME Kemp could not determine whether Olivia Lone Bear had drowned.

25.  Numerous interviews of family and friends have been conducted during the investigation into the disappearance and subsequent death of Olivia Lone Bear. One of those individuals, James Hofhenke, was interviewed multiple times. During one of the interviews, Hofhenke told investigators that one of the last text messages he received from Olivia Lone Bear stated that she was going "mudding." The text message, also observed on the cellular telephone that Hofhenke used to communicate with Olivia Lone Bear, stated "Welp we had a little bonfire now we are going mudding" "wish me luck." The next message stated, "Good Bye!!" To date, none of the individuals interviewed by investigators have identified anyone that went to a bonfire or went "mudding" with Olivia Lone Bear.

26.  On February 5, 2019, FBI Special Agents accessed Facebook on the Internet and conducted a "Facebook Search" query for the name Olivia Lone Bear. The query showed one result for Olivia Lone Bear. I reviewed the Facebook page associated with the name Olivia Lone

Bear and identified several photographs on the page as being of Olivia Lone Bear. I identified the Facebook "profile picture" as being a photograph of Olivia Lone Bear. Also, the Facebook page showed Olivia Lone Bear as a female with a date of birth of "October 11" and a family member was listed as "Texx Lone Bear." The cover photograph on her Facebook page was last updated on October 26, 2017. In the URL bar on the Facebook page, the unique identifier assigned by Facebook or chosen by Olivia Lone Bear is shown as "olivia.lonebear.5." Based upon law enforcement's investigation, we have learned that Olivia Lone Bear's family and friends lost contact with Olivia Lone Bear during the late evening of October 25, 2017 into the early morning hours of October 26, 2017.

27. Through training and experience, I know that individuals often establish relationships on Facebook and other social media. These online relationships may remain unknown to family and friends. Times and places to meet may be arranged through contacts on Facebook. I am requesting a search warrant authorizing the search of the Facebook account associated with Olivia Lone Bear, with the unique identifier olivia.lonebear.5, for the purpose of identifying possible communications between Olivia Lone Bear and possible individuals with whom she may have communicated with prior to her disappearance.

Respectfully submitted,

Bruce Bennett

Special Agent

Federal Bureau of Investigation

Subscribed and Sworn to before me on 6ct day of February, 2019 by telephone conference.

CHARLES S. MILLER, JR.

UNITED STATES MAGISTRATE JUDGE